**Matthew WATSON, a minor by his mother and natural guardian, June HANSON, Respondent,**

v.

**METROPOLITAN TRANSIT COMMISSION, Petitioner, Appellant.**

No. C5–95–1052.

Supreme Court of Minnesota.

Aug. 29, 1996.

Rehearing Denied Oct. 10, 1996.

Bennett, Brown, Ingvaldson, Coaty & McNeil, P.A., Frederick C. Brown, Donald R. McNeil, Minneapolis, Metropolitan Council, Jay M. Heffern, General Counsel, St. Paul, for Appellant.

Nelson Hanson Personal Injury Attorneys, Krister D. Johnson, St. Cloud, for Respondent.

League of MN Cities, Carla J. Heyl, St. Paul, for Amicus Curiae.

## OPINION

ANDERSON, Justice.

On Saturday evening, April 16, 1994, plaintiff Matthew Watson was a passenger on a bus owned and operated by appellant, Metropolitan Transit Commission (MTC), when he was assaulted by other passengers on the bus. Watson commenced an action against the MTC, alleging that the MTC breached its duty of care to him in failing to take reasonable steps to protect or assist him when he was assaulted. The MTC moved for summary judgment, contending that both statutory and official immunity [1] protect the deci-

---

1. Statutory immunity pursuant to Minn.Stat. § 466.03, subd. 6 (1994) has been referred to as statutory discretionary function immunity, statutory discretionary immunity, discretionary func-

sions of the MTC and its employees and insulate the MTC from liability. The district court denied the motion for summary judgment, and pursuant to rule 103.03(h) of the Minnesota Rules of Civil Appellate Procedure, certified to the Minnesota Court of Appeals as important and doubtful the following question:

> Does the doctrine of statutory discretionary immunity apply and shield defendant MTC from a suit in negligence by a passenger seeking recovery of money damages for injuries sustained in an assault by another passenger?

The MTC also appealed the order denying summary judgment. The court of appeals answered the certified question in the negative, determining that statutory immunity does not apply, and affirmed the denial of the MTC's summary judgment motion with respect to official immunity because disputes of material fact remained on that issue. We reverse.

At approximately 8:30 p.m. on Saturday, April 16, 1994, plaintiff, Matthew Watson, a 17–year–old white male, and his companion boarded a bus owned and operated by the MTC at the Mall of America Transit hub. The 60–foot articulated bus was an express bus to downtown Minneapolis. A number of passengers were already on the bus, and Watson and his companion took seats in the back. After Watson and his companion boarded the bus, 14 or 15 African–American males, aged 14 to 17, got on board and also went to the back. Watson testified that as they entered the bus, the young men were "loud and obnoxious," voicing epithets such as "honky" and "white trash."

The bus driver was 25–year–old Peter Malcolm. At the time these events occurred, Malcolm had worked for the MTC for about six months. When he began driving for the MTC, Malcolm received about two weeks of classroom training. As part of this training, Malcolm was instructed to remain in his seat if an altercation developed and to call in immediately on the radio to the MTC's radio

control center to get help. MTC bus drivers are prohibited from carrying weapons and Malcolm carried no weapon. The bus was equipped with a speaker system which allowed Malcolm to speak to persons in the back of the bus, but the bus had no speaker system which would allow Malcolm to hear what was going on in the back of the bus.

After the passengers boarded the bus, Malcolm shut the door and began the trip to Minneapolis, driving north on Highway 77 (Cedar Avenue) toward Highway 62 (Crosstown). After some moments, a fight broke out in the rear of the bus and some of the African–American males began assaulting Watson and his companion. Both Watson and his companion screamed to the bus driver to stop the bus. Watson testified that during the assault, the assailants shouted, "You white motherfuckers," and "We're going to kill you white honkies."

While the bus was northbound on Highway 77 approaching Highway 62, one of the passengers told Malcolm that there was a fight at the back of the bus and Malcolm immediately pushed the priority call button to communicate with the radio control center. The center responded within a few seconds and instructed Malcolm to drive north on Interstate 35W to Lake Street, where MTC police officers would be waiting.

Meanwhile, Watson's companion found mace in his pocket and sprayed the attackers. Passengers began moving toward the front of the bus to get away from the mace. Some of the passengers asked Malcolm to stop the bus to let them off, but Malcolm testified that he thought it unwise to let passengers off on the side of the freeway. Instead of stopping the bus, he instructed the passengers to open the windows to clear out the mace. Watson's companion decided to jump out of the moving bus through an emergency window exit, and he did so while the bus was navigating the Highway 62 cloverleaf. Shortly thereafter, one of the passengers informed Malcolm that someone had jumped out of the window.

---

tion immunity, and discretionary immunity. For purposes of this opinion, when referring to this legal concept, we use the term statutory immunity. Similarly, official immunity has also been

referred to as common law official immunity. For purposes of this opinion, when referring to this legal concept, we use the term official immunity.

Watson testified that soon after his companion fled, he felt two hands on his arms and back, and was himself thrown out the same emergency window exit. He also testified that his assailants had knives. Malcolm testified that he did not hear anyone saying "we're going to kill you," and that the bus quieted down after he was told that someone had jumped off.

MTC police officers met the bus when it arrived at the Lake Street stop. The officers watched the passengers disembark and then interviewed Malcolm concerning the incident. After the officers confirmed that Malcolm was prepared to continue the route, he was allowed to depart and he drove on to downtown Minneapolis, and then back to the Mall of America. When he arrived at the Mall, he was met by a state trooper and made a statement about the incident. Meanwhile, the Highway Patrol had taken Watson and his companion to the hospital.

Watson commenced an action against the MTC, claiming that the MTC owed a duty to exercise the highest degree of care to protect passengers, and that the MTC breached that duty in that it did not protect or assist him when he was injured in the assault. The MTC moved for summary judgment, asserting that it was protected by the doctrines of statutory and official immunity. The district court denied the motion for summary judgment, and certified to the court of appeals the question whether statutory immunity applies to shield the MTC from a suit in negligence by a passenger seeking recovery of money damages for injuries sustained in an assault by another passenger. The court of appeals answered the certified question in the negative, holding that statutory immunity does not apply. *Watson v. Metropolitan Transit Comm'n*, 540 N.W.2d 94 (Minn.App. 1995). The court of appeals also affirmed the denial of summary judgment on the basis of official immunity. We reverse.

### I.

■ This case presents two questions for our review. First, we are asked to review the certified question regarding statutory immunity posed by the district court and answered in the negative by the court of appeals. A certified question is one of law and reviewable de novo by this court. *See Foley v. Honeywell, Inc.*, 488 N.W.2d 268, 270 (Minn.1992).

■ Second, we review the denial of the MTC's motion for summary judgment on the basis of official immunity. Appeal from the district court's denial of a motion for summary judgment is proper when, as here, the district court certifies that the question presented is important and doubtful. Minn. R. Civ.App. P. 103.03(h). This court has also determined that an order denying summary judgment on the ground of immunity is appealable because immunity from suit is effectively lost if a case is erroneously permitted to go to trial. *Anderson v. City of Hopkins*, 393 N.W.2d 363, 364 (Minn.1986). On an appeal from summary judgment, this court determines whether there are genuine issues of material fact and whether the district court erred in applying the law. *Offerdahl v. University of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988).

■ Review of these two questions implicates the doctrines of statutory and official immunity. A court reviewing immunity issues must examine with particularity the nature of the conduct the plaintiff alleges as the basis of a negligence claim. *Pletan v. Gaines*, 494 N.W.2d 38, 40 (Minn.1992). Here, Watson alleged in his complaint that the MTC negligently "failed to take reasonable steps to protect or assist the Plaintiff [Watson] when he sustained injury from fellow passengers." Watson provided four more particular allegations of negligence in his memorandum to the district court in opposition to summary judgment, asserting that the MTC breached its duty to protect Watson by (1) failing to have security personnel ride the bus, (2) failing to adequately train the bus driver, (3) failing to use the intercom system to warn the passengers to stop fighting or to warn that the driver would call the police, and (4) failing to pull over to the side of the road and to stop the bus when the fight began. It is these allegations of negligence which the district court analyzed in issuing its order denying summary judgment. Subsequently, to the court of appeals and to this court, Watson has

alleged multiple acts of negligence in addition to the four above. He now seeks this court's scrutiny of all of the MTC's allegedly negligent acts and a determination of their status with respect to immunity.

## II.

We first address the question certified by the district court regarding whether statutory immunity applies to bar Watson's action against the MTC. Some background information regarding the MTC and its policies is helpful in the resolution of this question. The MTC was created in 1975 by statute, and its legal status was that of a public corporation and a political subdivision of the state. Minn.Stat. §§ 473.404, subd. 1, .405, subd. 2 (1992).[2] The MTC was granted the power to engineer, construct, equip, and operate transit systems. Minn.Stat. § 473.405, subd. 4 (1992). Minnesota Statutes section 473.407, enacted in 1993, governs the Metropolitan Transit Police and allows the MTC to appoint licensed peace officers to police its transit property and routes. Minn.Stat. § 473.407, subd. 1 (1994). The chief law enforcement officer of the Metropolitan Transit Police is charged with management of this law enforcement agency. *Id.* at subd. 4.

The acting chief of police for the MTC, David Hubenette, stated in his deposition that the chief of transit police weighs certain factors and determines whether MTC police officers should be located at various locations. Bus drivers may request that an MTC officer ride along on a route if the driver is concerned that a violent action could occur, but the decision to place an officer on a bus depends on the availability of personnel and an evaluation of the potential for a violent situation on a particular bus. This determination is usually made by the supervisor present at the transit hub.

The MTC provides training to its bus drivers on how to deal with difficult people. Hubenette stated that drivers may actually confront an abusive passenger on a bus, or may call central control to have them call the MTC police to meet the bus. The MTC has 120 bus routes, 160 part-time police officers, and 1,300 drivers. Hubenette stated that it is not possible to have a police officer riding every bus from the Mall of America.

Minnesota's Tort Claims Act generally allows governmental entities, such as the MTC, to be held liable for their torts subject to certain exceptions and limitations. *See* Minn.Stat. ch. 466 (1994). One of these exceptions to the general rule of liability is the "discretionary function" exception codified at section 466.03, subdivision 6, which provides that a public corporation and political subdivision is not liable for its torts and those of its officers, employees and agents acting within the scope of their employment "for any claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." Minn.Stat. §§ 466.02, .03, subd. 6 (1994). As a public corporation and a political subdivision of the state, the MTC enjoys this immunity, which is known as statutory immunity.

Statutory immunity exists to prevent the courts from conducting an after-the-fact review which second-guesses "certain policy-making activities that are legislative or executive in nature." *Nusbaum v. Blue Earth County*, 422 N.W.2d 713, 718 (Minn. 1988). If a governmental decision involves the type of political, social and economic considerations that lie at the center of discretionary action, including consideration of safety issues, financial burdens, and possible legal consequences, it is not the role of the courts to second-guess such policy decisions. *Steinke v. City of Andover*, 525 N.W.2d 173, 176 (Minn.1994). In determining what constitutes a discretionary function, this court has drawn a distinction between "planning level" conduct, which is protected by immunity, and "operational level" conduct, which is not protected. *Nusbaum*, 422 N.W.2d at 719. Planning level conduct includes: decisions regarding deployment of police forces, *Silver v. City of Minneapolis*, 284 Minn. 266,

---

2. As part of the Metropolitan Reorganization Act of 1994, on January 2, 1995, the duties and responsibilities of the Metropolitan Transit Commission were transferred to the Metropolitan Council as the successor entity to the Metropolitan Transit Commission. Act of May 10, 1994, ch. 628, art. 2, § 4, subd. 2, § 6 1994 Minn. Laws 1710–11.

271, 170 N.W.2d 206, 209 (1969); a decision to release a mentally retarded youth from a state institution for a holiday home visit, *Cairl v. State*, 323 N.W.2d 20, 24 (Minn. 1982); and a decision to place certain warning signs only on county roads and recognized rights-of-way, *Steinke*, 525 N.W.2d at 176. "The crucial question, as always, is whether the conduct involves the balancing of public policy considerations in the formulation of policy." *Holmquist v. State*, 425 N.W.2d 230, 234. We have said that "[p]lanning level decisions are those involving questions of public policy, that is, the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy." *Id.* at 232.

We first apply the principles of statutory immunity to Watson's first two allegations of negligence: that the MTC failed to have security personnel ride the bus and that the MTC failed to adequately train its bus driver.

■ As we stated above, the test for determining whether statutory immunity protects the conduct of the MTC is whether the challenged conduct involved evaluation of the financial, political, economic or social effects of a given policy. The MTC's policy regarding response to crimes that occur on MTC buses reflects a balancing of financial, social and economic issues concerning passenger safety and management of limited resources. The legislative determination of funding for public transit does not permit unlimited security measures on the public transit system, and the MTC's determination of how most effectively to allocate security resources is a policy decision. The MTC must balance the measures it takes to protect the safety of passengers against the limited funds available for that purpose. We have held that a city's decision regarding how most effectively to deploy its police and fire manpower is a decision shielded by statutory immunity. *Silver v. City of Minneapolis*, 284 Minn. at 271, 170 N.W.2d at 209 (deployment of police forces to control rumored impending riot a protected decision). Here, the MTC's decision regarding how most effectively to deploy security resources constitutes planning level conduct, which is protected by statutory immunity.

■ The MTC's policy with regard to the training of its drivers also requires the balancing of financial, economic and social considerations. In an analogous case, the court of appeals considered a challenge to the City of Brainerd's training of a police officer who shot and killed a suspect. *Maras v. City of Brainerd*, 502 N.W.2d 69 (Minn.App.1993). The court of appeals held that the training a city provides to its police officers is a policy decision because the city must decide what kinds of training the officers need and must take into account the resources available to the city to pay for such training. *Id.* at 78. Similarly, in providing training for its bus drivers, the MTC must balance the needs of the drivers, the MTC, and its passengers, and must take into account the resources available to pay for such training. Here also, the MTC's decisions with regard to the training of its drivers constitute planning level conduct, protected by statutory immunity.

We have previously noted that the distinction between the making of policy and the implementation of policy is not as simple as plaintiffs often contend. *Pletan*, 494 N.W.2d at 44. In *Pletan*, a school district and a police officer were sued when a second-grade student, who had not boarded his assigned school bus, was struck and killed by a fleeing suspect's automobile during a high-speed chase by police. *Id.* at 39–40. The plaintiff in that case contended that making sure that children assigned to buses get on the correct bus was a day-to-day operational-level implementation of an established policy and thus unprotected by immunity. *Id.* at 44. Holding otherwise, this court stated:

> The distinction between "making" and "implementing" policy is not so simple as plaintiffs would have it. Until people carry out a governmental policy, by doing or not doing something, the policy is a dead letter. Discretionary function immunity [i.e., statutory immunity] would afford little comfort if it did not extend to some of the consequences of the policy itself. Whether certain consequences are immune depends, as we have noted, on whether the consequential conduct itself involves the balancing of public policy consideration in the formulation of policy.

*Id.* at 44; *see also Smith v. Johns–Manville Corp.*, 795 F.2d 301, 308 (3d Cir.1986) (warning that decision-making should not be "broken down into component parts" and isolated from the context of the overall plan). The *Pletan* court noted that the plaintiff disagreed with the school district's policy determination that boarding the correct bus is the student's responsibility and therefore the plaintiff was attempting to have the court reexamine the school district's policy considerations. *Pletan*, 494 N.W.2d at 44. The court held that statutory immunity protects the school district from such reassessments. *Id.*

In the present case, Watson does not challenge MTC actions that are unprotected policy implementation; but, as in *Pletan*, Watson's challenges amount to an attack upon the policies themselves. Therefore, we conclude that statutory immunity bars suit on the first two of Watson's allegations of negligence against the MTC, which allegations challenge the MTC's decisions regarding whether security personnel are present on a bus and those regarding the training of its drivers.

### III.

We next turn to Watson's other two allegations, that the MTC's bus driver was negligent in not using the intercom system to warn the passengers to stop fighting or to warn that he would call the police, and that the driver was negligent in failing to pull over to the side of the road and to stop the bus when he learned that the fight had begun. Political subdivisions, including the MTC, may be liable for the torts of their officers, employees, or agents acting within the scope of their employment under the doctrine of respondeat superior. *See* Minn. Stat. § 466.02 (1994); *Westby v. Itasca County*, 290 N.W.2d 437, 438 (Minn.1980). If official immunity protects the government employee, here the bus driver, from suit, the government entity will not be liable for its employee's torts under the statute or under

common law respondeat superior. The common law doctrine of official immunity "protects from personal liability a public official charged by law with duties that call for the exercise of judgment or discretion unless the official is guilty of a wilful or malicious wrong."[3] *Rico v. State*, 472 N.W.2d 100, 106–07 (Minn.1991); *see also Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn.1988).

Official immunity differs from statutory immunity in that statutory immunity is " 'designed to preserve the separation of powers,' whereas official immunity primarily is 'intended to insure that the threat of potential liability does not unduly inhibit the exercise of discretion required of public officers in the discharge of their duties.' " *Rico*, 472 N.W.2d at 107 (citing *Holmquist*, 425 N.W.2d at 233 n. 1). Discretion has a broader meaning in the context of official immunity than in the context of statutory immunity. *Rico*, 472 N.W.2d at 107; *Elwood*, 423 N.W.2d at 678. Unlike statutory immunity, official immunity protects the kind of discretion which is exercised on an operational rather than a policymaking level. But the discretion involved with official immunity requires "something more than the performance of 'ministerial' duties." *Pletan*, 494 N.W.2d at 40. An official's duty is ministerial when it is "absolute, certain and imperative, involving merely execution of a specific duty arising from fixed and designated facts." *Cook v. Trovatten*, 200 Minn. 221, 224, 274 N.W. 165, 167 (1937) (quoting *People v. May*, 251 Ill. 54, 57, 95 N.E. 999, 1000 (1911)).

Statutory immunity protects government entities and includes protection for the employee because:

the state is required to indemnify the employee for acts and omissions committed within the scope of employment except "in case of malfeasance in office or willful or wanton actions or neglect of duty." In instances where the employee is not in-

---

3. Official immunity does not protect an official who commits a willful or malicious wrong. Malice means "the intentional doing of a wrongful act without legal justification or excuse, or otherwise stated, the willful violation of a known right." *Rico*, 472 N.W.2d at 107 (quoting *Carnes*

*v. St. Paul Union Stockyards Co.*, 164 Minn. 457, 462, 205 N.W. 630, 631 (1925)). Nothing in the record on summary judgment indicates that the bus driver intentionally violated a known right, nor has the plaintiff alleged malice on the part of Malcolm.

demnified, the employee's only potential shield is official immunity.

*Rico,* 472 N.W.2d at 106 n. 4. (citing Minn. Stat. § 3.736, subd. 9 (1990)). Official immunity protects employees or agents of the government entity. Where an employee or agent is protected by official immunity, the government entity will not be called on to indemnify that individual nor will the government entity be liable under the doctrine of respondeat superior.

■ The MTC focuses on the public policy underlying official immunity, and argues that the decisions of MTC employees should be protected. The MTC contends that, without the protection of official immunity, its employees would be deterred from exercising judgment, and the result would be timidity in situations which arguably require more assertive control. The MTC also maintains that Malcolm's decision not to use the intercom system and his decision not to stop the bus along the freeway are not ministerial, absolute and certain, but are decisions which require the exercise of discretion and judgment.

■ We have determined that in an emergency situation where a possibly armed man was threatening to harm his ex-wife and himself, police officers must exercise significant independent judgment, and their decisions are protected. *Elwood v. Rice County,* 423 N.W.2d 671, 678–79 (Minn.1988). However, an emergency situation need not exist for official immunity to apply. *See Olson v. Ramsey County,* 509 N.W.2d 368 (Minn.1993) (county social worker's formulation of a case plan for a mother and an abused child was protected by official immunity because it involved judgment at more than a ministerial level); *Rico,* 472 N.W.2d at 106–07 (official immunity applied in a breach of employment contract action to protect the Commissioner of Veterans Affairs' decision to terminate an unclassified policy-making official who could be discharged at any time without reason).

■ Here, Malcolm's decisions in a situation where passengers were being assaulted were clearly not "absolute, certain and imperative, involving merely execution of a specific duty arising from fixed and designated facts." The situation unfolded in a manner which was far from "fixed and designated," and called for the exercise of judgment and discretion on the part of Malcolm for the protection of all the passengers on the bus. Furthermore, the public policy underlying official immunity, to ensure that the threat of liability does not inhibit the exercise of discretion required of public officers, supports the immunization of Malcolm's decisions. We conclude that the exercise of discretion required of Malcolm in the volatile situation caused by the assault upon Watson and his companion is protected by official immunity. Further, it would be anomalous under the circumstances of this case to impose liability on the MTC for the very same acts for which Malcolm receives immunity. *See Pletan,* 494 N.W.2d at 42. Therefore, because Malcolm's decision not to use the intercom system and his decision not to pull over to the side of the road are protected by official immunity, the MTC is also immune from suit for the effect of his decisions.

## IV.

We have said that in analyzing any immunity question it is essential to identify the precise governmental conduct at issue. *Olson,* 509 N.W.2d at 371. At the district court, Watson identified four precise acts of governmental conduct, enumerated in his memorandum in opposition to summary judgment, which acts he asserted were the basis of his negligence claim against the MTC. Watson later placed before the court of appeals at least 15 acts of alleged negligence on which he sought to base liability. In addressing allegations beyond the four original acts of governmental conduct, the court of appeals denied summary judgment, holding that material fact issues remained for trial; that is, whether discretion was exercised by the dispatcher in directing the bus driver to go to 35W and Lake Street. However, no act of the dispatcher had been challenged as negligent at the district court level.

Watson now brings before this court 17 MTC acts of alleged negligence, some of which are acts or policies of the MTC and some of which are conduct of the bus driver, the dispatcher, or the transit police officers.

Watson now challenges, among others things, the MTC's decision to use a 25–year–old bus driver, who, Watson claims, was "overworked." He further challenges the MTC's decision to use a 60–foot articulated bus on this route, MTC's decision not to use security cameras, and MTC's staffing decisions regarding dispatch personnel.

A plaintiff must allege the acts of negligence which it intends to prove at trial. The defendant has only the burden of responding to those allegations of negligence of which it has been put on notice. *See Arvidson v. Slater,* 183 Minn. 446, 452, 237 N.W. 12, 15 (1931). A plaintiff cannot bring forth new allegations of negligence at the appellate level in the hope of finding a chink in the armor of immunity which will allow the case to survive summary judgment and go to trial. *Id.* We review the denial of summary judgment here as the matter was submitted to the district court, and determine that Watson is limited to the four original allegations of negligence that were submitted to that court. Since we have determined that all four acts or decisions challenged by Watson are protected by immunity, the MTC is entitled to judgment as a matter of law, and denial of summary judgment was not proper.

Reversed and remanded for entry of judgment consistent with this opinion.