Robyn COUSIN, Trustee of the Estate
of Jose Cousin, Respondent,

v.

HENNEPIN COUNTY MEDICAL
CENTER, et al., Appellants,

St. Paul Ramsey Medical Center,
et al., Defendants.

No. C2–96–1732.

Court of Appeals of Minnesota.

June 10, 1997.

Review Denied Aug. 26, 1997.

Larry E. Reed, Dannia L. Edwards, Hassan & Reed, Ltd., Minneapolis, for Respondent.

Michael O. Freeman, Hennepin County Attorney, Michael B. Miller, Assistant County Attorney, Minneapolis, for Appellants.

Considered and decided by DAVIES, P.J., and NORTON and KALITOWSKI, JJ.

## OPINION

NORTON, Judge.

Following a jury verdict finding appellant 35% negligent for decedent's suicide, appellant filed a motion for judgment notwithstanding the verdict or a new trial. Appellant alleges the trial court erred by denying these motions because: (1) it was protected by official and/or statutory immunity; (2) respondent's liability expert was not qualified to testify at trial; (3) respondent failed to make a prima facie case of negligence; (4) reversible errors of law at trial mandated a new trial; and (5) the jury verdict was excessive and not supported by the evidence. Appellants also filed a motion for remittitur and an offset in damages for decedent's unpaid child support. The trial court denied all of appellants' motions except for the offset for unpaid child support. In addition, respondent contends that the trial court: (1) abused its discretion by awarding limited expert witness fees; (2) erred by not awarding prejudgment interest; and (3) erred by granting an offset from the verdict amount. The trial court erred in denying appellant's JNOV motion because appellant is protected by statutory immunity. We reverse, and, given our conclusion, decline to reach respondent's arguments.

## FACTS

In the early morning of July 18, 1991, Jose T. Cousin (decedent) threatened to drive his car off the Mendota Bridge. Police took decedent to Divine Redeemer Hospital. Later in the morning, decedent was transferred to St. Paul Ramsey Medical Center (SPR) by ambulance. Because decedent was without insurance, SPR initiated proceedings to transfer him to Hennepin County Medical

Center's Crisis Center (the Crisis Center) for further evaluation and treatment. William Mockenhaupt, a senior clinical psychiatric social worker at SPR evaluated decedent and determined he was disoriented, depressed, and suicidal. Mockenhaupt filled out a transportation hold, which is a legal document under Minn.Stat. § 253B.05, subd. 2 (1996), requiring the signatory to assure that the patient is in supervised custody at all times.

To effectuate the transfer, Mockenhaupt spoke to Jan Wesley, a psychiatric mental health nurse at the Crisis Center. Mockenhaupt explained decedent's case to her and told her that decedent was on a transportation hold. SPR then called HealthOne, an ambulance service, to transfer decedent to the Crisis Center. Emergency medical technicians (EMTs) Erin Goffin and Robert Byer, HealthOne ambulance drivers, picked up decedent at SPR. Goffin signed decedent's transportation hold. When the ambulance arrived at HCMC, Goffin and Byer took decedent out of the ambulance and began walking toward HCMC's Crisis Center. Generally, two EMTs accompany a transportation hold patient into the Crisis Center: one EMT discusses the case with Crisis Center staff and the other stays with the patient until security arrives. Despite that usual routine, Byer returned to the ambulance.

Goffin testified that, as he and decedent entered the Crisis Center, one of two women behind the reception desk pointed to a chair for decedent. As Goffin was seating decedent, Crisis Center clinician, Yvonne Sando, entered the reception area and asked whether decedent was Jose Cousin. Goffin responded affirmatively. Earlier in the day, Wesley had told Sando and two other Crisis Center clinicians, Ana Marie Lopez and Dianne Peppard, that the Crisis Center would be receiving a patient named Jose Cousin from SPR under a transportation hold.

Sando then directed Goffin to follow her into the communication room. Goffin followed her, leaving decedent unattended in the reception area. As Goffin began giving the clinicians his report, Sando asked him if decedent was on a hold, as she had been told by Wesley. When Goffin told her that decedent was not on a hold, Sando was surprised and began to look through decedent's paper work. As Sando was looking through the paperwork, Lopez signed the transfer papers. Immediately thereafter, Sando discovered the hold. Lopez, Sando, and Goffin went to the reception area to look for decedent, but found that he was gone. They called security and began searching for decedent. They found decedent in the emergency room with fatal injuries sustained from jumping off the seventh floor of a nearby parking ramp.

Respondent Robyn Cousin (Cousin), trustee of the next of kin of decedent Jose Cousin, brought this wrongful death action against SPR and its employee, Mary Pat Fox; HealthOne and its employees, Erin Goffin and Robert Byer; and HCMC's Crisis Center and its employee, Ana Marie Lopez.

The action against SPR was dismissed for failure of proper service and failure to meet the statute of limitations. The parties stipulated to dismiss the action against SPR's employee, Mary Pat Fox. HealthOne and its employees, Erin Goffin and Robert Byer, were dismissed from the action upon their settlement agreement with Cousin. The Crisis Center and Lopez, the sole remaining defendants, filed a motion for summary judgment on the grounds that they were protected by statutory and official immunity or that Cousin had failed to present a prima facie case of negligence against them. Cousin filed a countermotion for summary judgment against the Crisis Center and Lopez. The trial court denied both parties' motions for summary judgment.

A jury rendered a special verdict finding HealthOne, Byer, and Goffin 65% negligent and the Crisis Center and Lopez 35% negligent in decedent's suicide. The jury awarded Cousin $500,000 in damages.

## ISSUE

Did the trial court err by concluding that the Crisis Center and Lopez were not protected by statutory and/or official immunity?

## ANALYSIS

■ The Crisis Center contends that the trial court erred in denying its JNOV motion because it is immune under either statutory or official immunity. Whether a governmental entity is protected by statutory or official immunity is a legal question that this court reviews de novo. *Johnson v. State*, 553 N.W.2d 40, 45 (Minn.1996).

■ Political subdivisions are immune from "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." Minn.Stat. § 466.03, subd. 6 (1996). Statutory immunity exists to prevent courts from second-guessing policymaking activities that are legislative or executive in nature. *Nusbaum v. Blue Earth County*, 422 N.W.2d 713, 718 (Minn.1988). If a governmental decision involves political, social, and economic considerations "that lie at the center of discretionary action, including consideration of safety issues, financial burdens, and possible legal consequences, it is not the role of courts to second-guess such policy decisions." *Watson v. Metropolitan Transit Comm'n*, 553 N.W.2d 406, 412 (Minn.1996).

■ In determining whether conduct is discretionary, the court distinguishes between protected "planning level" conduct and unprotected "operational" conduct. *Id.* (quoting *Nusbaum*, 422 N.W.2d at 719). Immune planning level decisions involve questions of public policy, which are "the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy." *Holmquist v. State*, 425 N.W.2d 230, 232 (Minn.1988). Conversely, operational level decisions "involve decisions relating to the ordinary day-to-day operations" of government and are not immune. *Id.*

■ "A court reviewing immunity issues must examine with particularity the nature of the conduct the plaintiff alleges as the basis of a negligence claim." *Watson*, 553 N.W.2d at 411. Cousin alleges that the trial court properly denied immunity because the Crisis Center clinicians negligently performed their duties with respect to decedent[1] when they failed to take reasonable and adequate steps to supervise and secure him, given their knowledge of his case and his transportation hold status. Cousin contends that, although the Crisis Center has a policy for dealing with suicidal patients, Crisis Center clinicians failed to implement it properly, thereby causing decedent's suicide. To support its allegation that the clinicians were negligent, Cousin cites the jury's verdict, finding Crisis Center clinicians 35% negligent in decedent's suicide.

The Crisis Center's policy for the intake of suicidal patients is to meet with an EMT in the Crisis Center communication room to identify the patient and determine the hold status. If the patient is under a transportation hold, the Crisis Center calls security immediately and transfers the patient to a locked holding room. The Crisis Center does not have a security guard on duty at all times or even when it has received a transfer call from another hospital advising that a patient will be arriving on hold, because referring institutions frequently convey inaccurate information regarding patients' arrival times and hold statuses. Therefore, Crisis Center clinicians first confirm the hold status of the patient with the EMT and then call security, if necessary. The Crisis Center contends that this policy was adopted because the Crisis Center found it inefficient to have security waiting in the Crisis Center for hold patients who did not arrive when expected. Moreover, the Crisis Center does not want a security guard present at all

---

1. The Crisis Center argues that it is statutorily immune because the clinicians were performing duties that involved discretionary professional treatment decisions with respect to decedent. *See Engle v. Hennepin County*, 412 N.W.2d 364, 366–67 (Minn.App.1987) (holding that Crisis Center social worker's decision to allow patient's spouse to drive him to another hospital was protected by statutory immunity because decision was based on social worker's professional evaluation of information obtained during psychological interview with patient), *review denied* (Minn. Nov. 18, 1987). This case is distinguishable from *Engle*. *Engle* involved a challenge to a decision made by an employee regarding the evaluation and treatment of a patient, whereas, in this case, the Crisis Center clinicians made no evaluation or treatment decision regarding decedent.

times because it wants to maintain a non-threatening atmosphere for patients who arrive voluntarily.

Cousin argues that the clinicians were negligent when they failed to implement the Crisis Center's policy by failing to call security immediately on decedent's arrival. The undisputed facts, however, demonstrate that Sando's conduct was not a deviation from the Crisis Center policy. Before calling security, the Crisis Center's policy required Sando to verify the hold status of the patient in the communication room. When Sando did this, the EMT told her that decedent was not under a transportation hold. Sando and Lopez checked decedent's paperwork to verify this information. On finding the transportation hold document, Sando called security immediately in accordance with the Crisis Center policy, but decedent was already gone.

The court must be cautious when distinguishing the making of policy from the implementation of policy. *Watson*, 553 N.W.2d at 413. Moreover, as previously stated, it is imperative in an immunity case to examine the conduct the plaintiff alleges as negligence. *Id.* at 411. In this case, the negligence alleged does not arise from the clinicians' failure to implement the Crisis Center's policy. Rather, Cousin is alleging that the Crisis Center was negligent due to its policy not to have a security guard present in the Crisis Center reception area at all times. This policy, however, was the result of balancing patient treatment issues, employee efficiency, and economics. The Crisis Center's weighing of these planning issues "lie[s] at the center of discretionary action." *Id.* at 412. It is not proper for this court to second-guess such policymaking activity. *Nusbaum*, 422 N.W.2d at 718. Therefore, because the Crisis Center is protected by statutory immunity, the trial court erred by failing to grant the Crisis Center's JNOV motion.

Due to our conclusion that the Crisis Center is protected by statutory immunity, we decline to reach the remainder of the issues on appeal.

## DECISION

The Crisis Center is protected by statutory immunity. The Crisis Center's policy did not require that a security guard be called until the Crisis Center clinicians verified the hold status of decedent. This policy was the result of balancing patient treatment issues, employee efficiency, and economics, and is, therefore, immune discretionary policymaking. The trial court erroneously denied the Crisis Center's motion for JNOV.

**Reversed.**