# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 06-1356

_____

| | | |
|---|---|---|
| Allison Sanders, Individually and as Trustee for the heirs and next of kin of Alfred Charles Sanders, | * * * * | |
| Appellant, | * * | |
| v. | * * | Appeal from the United States District Court for the |
| City of Minneapolis, Minnesota; Robert Olson, Chief of Police; Minneapolis Police Department; Valorie Gogligowski; Hien Dinh; Lupe Herrera; Matthew Blade; Josef Garcia; Augsburg College Security and Wolf Protection Agency; Steven Manhood; Minneapolis Park Police, | * * * * * * * * * * * | District of Minnesota.  [PUBLISHED] |
| Appellees. | * | |

_____

Submitted: January 15, 2007
Filed: January 23, 2007

_____

Before WOLLMAN, HANSEN, and COLLOTON, Circuit Judges.

_____

HANSEN, Circuit Judge.

Alison[1] Sanders appeals the district court's[2] dismissal of her civil lawsuit related to the shooting death of her husband, Alfred Sanders, by Minneapolis police officers. Although the incident was tragic, the facts do not support the claims, and we affirm.

Alfred Sanders suffered from a bipolar disorder. On October 31, 2000, his friends contacted Minneapolis police in an attempt to have him committed to a crisis center, but the police were unable to locate him. Around 7:00 a.m. the next morning, during his patrol, Josef Garcia, a security guard for Augsburg College, noticed a vehicle (which turned out to be driven by Alfred) driving on the sidewalk of a street adjacent to the campus. Garcia followed the car and radioed Augsburg dispatch, requesting it to contact the Minneapolis Police Department. Garcia continued to follow the vehicle, which drove erratically, for approximately fifteen to twenty minutes until it pulled into the north end of an alley and parked in a parking space just off the alley. Garcia parked in the middle of the alley and stood by his vehicle, waiting for the police to arrive. Meanwhile, the Minneapolis police dispatched two squad cars to respond to an erratic driver, relaying the vehicle's location from the Augsburg dispatch. One squad, comprised of Officers Matthew Blade and Hien Dinh, had responded to the crisis call the previous day. They reported to the other officers and to dispatch that this call may involve a crisis candidate.

The squad cars entered the south end of the alley about two minutes after Alfred parked in the alley, and the officers exited their vehicles. A fifth officer, Steven Manhood of the Minneapolis Park and Recreation Board police department, responded to the call as well and reached the scene a few seconds after the other officers. Officer

_____

[1]We use the correct spelling of the parties names, including Alison Sanders and Valorie Goligowski, throughout the opinion, though they are spelled differently in the official case caption.

[2]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

Valorie Goligowski approached Alfred's car, telling him to put his hands where she could see them. Alfred did not respond, but put his car in reverse and backed into Garcia's security vehicle, next to which Garcia was standing. The officers believed Garcia would be trapped or hit by Alfred's car. Alfred then put the vehicle in drive and accelerated down the alley toward Officers Blade and Lupe Herrera, who were on foot. Officer Blade was a few feet directly in front of Alfred's car, and he fired two shots from his revolver through the windshield as Alfred's vehicle drove toward him. Goligowski believed that Blade was trapped under Alfred's car, and she fired her weapon at Alfred. Alfred's car continued down the alley toward Officer Herrera, who was able to jump out of its path, until it collided with one of the squad cars. Each of the police officers fired at Alfred's car as it passed them and continued down the alley. Alfred was shot 14 times and was pronounced dead at the scene. Each of the officers believed that Alfred was attempting to run over Officers Blade and Herrera, and they feared for their lives or the lives of their fellow officers.

Alison Sanders brought a civil lawsuit against each of the individual officers, their employing agencies, Mr. Garcia, and Augsburg College. Ms. Sanders alleged violations of 42 U.S.C. § 1983; 42 U.S.C. § 1985; the Americans with Disabilities Act (ADA); and she brought claims for failure to train under Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658 (1978), and state law negligence. The district court granted summary judgment to all defendants on all claims. Ms. Sanders appeals the dismissal of the § 1983 claim, the Monell failure to train claim, and the ADA claim. She also appeals the $4,500 sanction entered against her attorney for failing to timely withdraw an expert witness.

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view all evidence in the light most favorable to the nonmoving party. Mershon v. St. Louis Univ., 442 F.3d 1069, 1073 (8th Cir. 2006). The nonmoving party may not rest on her pleadings "but must demonstrate on the record the existence

of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). We review the district court's grant of summary judgment *de novo*, applying the same standards applied by the district court. Mershon, 442 F.3d at 1073.

Section 1983 imposes civil liability on government officials, including police officers, who violate an individual's constitutional rights. 42 U.S.C. § 1983. Officers are entitled to qualified immunity, however, "if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" McCaslin v. Wilkins, 183 F.3d 775, 778 (8th Cir. 1999) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In addressing an officer's claimed entitlement to qualified immunity, the court must first determine whether the allegations amount to a constitutional violation, and then, whether that right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001).

A § 1983 claim alleging the use of deadly force implicates the Fourth Amendment's protection against unreasonable seizures. See Graham v. Connor, 490 U.S. 386, 394-95 (1989). However, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." Brosseau v. Haugen, 543 U.S. 194, 197-98 (2004) (per curiam) (internal marks omitted and alteration in original); see also Hernandez v. Jarman, 340 F.3d 617, 622 (8th Cir. 2003).

The undisputed evidence reveals that Officer Goligowski told Alfred to show his hands, that Alfred did not respond but instead backed his car into the security guard's vehicle, and that he then accelerated down the alley toward other officers, two of whom were close to his vehicle and directly in its path. Sanders has provided no admissible evidence to contradict the officers' testimony that they each believed Alfred was trying to run over Officers Blade and Herrera. Given the quickly evolving

scenario, the officers' actions in shooting Alfred in an attempt to stop him from injuring the officers in his path were objectively reasonable and did not violate Alfred's Fourth Amendment right to be free from unreasonable seizures. See Hernandez, 340 F.3d at 623-24 (finding no constitutional violation where officer shot victim after the victim rammed a fellow officer's vehicle and appeared to be driving toward the shooting officer, despite discrepancies in the testimony about when exactly the shots were fired); Troupe v. Sarasota County, Fla., 419 F.3d 1160, 1168-69 (11th Cir. 2005) (holding officers' actions of shooting driver to be objectively reasonable where the driver refused to obey commands to put his hands up and his car suddenly lurched forward, leaving the officers "to make split-second decisions of whether they could escape before anyone suffered serious injury"), cert. denied, 126 S. Ct. 1914 (2006).

The district court properly disregarded the unsworn statements to a police investigator by an eyewitness, who was 150 feet from the action and whose view was blocked by the squad cars. The statements constituted double hearsay and were not exempted by any of the hearsay exceptions. See United States v. Taylor, 462 F.3d 1023, 1026 (8th Cir. 2006); Sallis v. Univ. of Minn., 408 F.3d 470, 474 (8th Cir. 2005) (requiring admissible evidence to rebut summary judgment).

The fact that Alfred may have been experiencing a bipolar episode does not change the fact that he posed a deadly threat against the police officers. "Knowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public when faced with threatening conduct by the disabled individual." See Bates ex rel. Johns v. Chesterfield County, Va., 216 F.3d 367, 372 (4th Cir. 2000).

Without a constitutional violation by the individual officers, there can be no § 1983 or Monell failure to train municipal liability. See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam); Walker v. Bonenberger, 438 F.3d 884,

890 (8th Cir. 2006). To the extent Sanders appeals the dismissal of the § 1983 claims against Garcia and Augsburg College, we note that "[p]rivate actors may incur section 1983 liability only if they are willing participants in a joint action with public servants acting under color of state law." Johnson v. Outboard Marine Corp., 172 F.3d 531, 536 (8th Cir. 1999). Neither Garcia, who did nothing more than follow Alfred, nor Augsburg College was acting under color of state law. See Reasonover v. St. Louis County, Mo., 447 F.3d 569, 584 (8th Cir. 2006) (to be deemed a state actor, private party must perform a function "traditionally exclusively reserved to the state" (internal marks omitted)); Young v. Harrison, 284 F.3d 863, 870 (8th Cir. 2002); Youngblood v. Hy-Vee Food Stores, Inc., 266 F.3d 851, 855 (8th Cir. 2001). Further, since Sanders has "failed to establish that a state actor violated [Alfred's] rights under the Constitution or laws of the United States, [her] claim[] against the private actors must also fail." Johnson, 172 F.3d at 536. The district court properly granted summary judgment to all of the defendants on Sanders' § 1983 claims and the Monell claim against the City of Minneapolis.

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, . . . be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Sanders does not identify the "benefits . . ., programs, or activities," id., that were denied to Alfred, but argues that had the City properly trained its officers in how to approach individuals with mental illnesses, the situation would not have escalated to the point of needing to use deadly force. It was not the City's failure to train its officers, but Alfred's apparent attempt to run over the officers that precipitated the shooting. See Hainze v. Richards, 207 F.3d 795, 801 (5th Cir.) ("Hainze was not denied the benefits and protections of Williamson County's mental health training *by* the County, Sheriff Richards, or the officers. Rather, Hainze's assault of Allison with a deadly weapon denied him the benefits of that program."), cert. denied, 531 U.S. 959 (2000); see also Bates, 216 F.3d at 373 (rejecting an ADA claim because "the stop, the use of force, and the arrest of Bates [an autistic teenager] were not by reason of Bates'

disability, but because of Bates' objectively verifiable misconduct. Such reasonable police behavior is not discrimination."). The City of Minneapolis, the only public entity at issue, see 42 U.S.C. § 12132, did not violate Alfred's rights under the ADA.

We review the imposition of sanctions for an abuse of discretion. United States v. Pugh, 445 F.3d 1066, 1068 (8th Cir. 2006). The defendants asked Sanders' attorney to withdraw Sanders' expert on July 18, 2005, based on misrepresentations and falsehoods contained in the expert's curriculum vitae. Sanders' attorney asked for fourteen days to consider the request, but did not respond for two-and-a-half months, and then only after the defendants filed a Motion to Strike the expert. The district court's $4,500 sanction, in light of the reported $40,000 cost to challenge the expert, was not an abuse of discretion.

The district court's judgment is affirmed. The motion to strike portions of the appellant's appendix is denied.

_____